AO 106 (Rev. 01/09) Application for a Search Warrant

# United States District Court
### for the
### Western District of New York

FILED
UNITED STATES DISTRICT COURT
NOV 01 2018
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address.)*

Silver LG/Metro PCS Cell Phone with no identifiable number in a black protective case; black iPhone/Cricket cell phone, with no identifiable number, in a black protective case; black MuveMusic SIM card with no identifiable number; blue MuveMusic SIM card with no identifiable number; and black SanDisk SIM card with no identifiable number

Case No. 18-mj- *168*

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached hereto and incorporated herein by reference.

located in the Western District of New York, there is now concealed *(identify the person or describe the property to be seized)*:

The items set forth in the Schedule of Items to be Seized, attached hereto as Attachment B and incorporated herein by reference.

The basis for search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of 21 U.S.C. §§ 841(a)(1), 843(b), 844(a) and 846.

The application is based on these facts:
- ☒ continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

JOSEPH J. STROH
Special Agent
Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: November 1, 2018

_____
*Judge's signature*

HONORABLE H. KENNETH SCHROEDER, JR.
United States Magistrate Judge
*Printed name and Title*

City and state: Buffalo, New York

## ATTACHMENT A

## DESCRIPTION OF SUBJECTS TO BE SEARCHED

### SUBJECT PHONE 1

Silver LG/Metro PCS Cell Phone with no identifiable number in a black protective case.



## SUBJECT PHONE 2

Black iPhone/Cricket cell phone, with no identifiable number, in a black protective case.



## SUBJECT SD CARDS 1, 2, 3

Black MuveMusic SIM card with no identifiable number ("**SD Card 1**"); blue MuveMusic SIM card with no identifiable number ("**SD Card 2**"); and black SanDisk SIM card with no identifiable number ("**SD Card 3**").





## **ATTACHMENT B**

## **SCHEDULE OF ITEMS TO BE SEARCHED FOR AND SEIZED**

Items comprising evidence of, or property designed for use, intended for use, or used in committing violations of Title 21, United States Code, Sections 841(a)(1), 843(b), 844(a) and 846, consisting of:

a)   Records of telephone calls, including incoming, outgoing, and missed calls, phone contact addresses, email addresses and telephone numbers in directories, documents and files which reflect names, email addresses, addresses, telephone numbers and objects related to drug trafficking, and photographs regarding drug trafficking and drug trafficking associates contained in the cellular telephones;

b)   Text messages and emails contained in the cellular telephones related to drug trafficking and drug trafficking associates; and

c)   Records regarding the ownership and/or possession of the searched items.

**AFFIDAVIT**

STATE OF NEW YORK  )
COUNTY OF ERIE       )    SS:
CITY OF BUFFALO     )

    I, **JOSEPH J. STROH**, being duly sworn, depose and state:

    1.    I am employed as a Special Agent ("SA") for the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), Immigration and Customs Enforcement ("ICE"), since June 2009. I am currently assigned to the HSI Buffalo Border Enforcement and Security Task Force ("BEST"), an HSI sponsored law enforcement task force comprised of local, state, federal, and Canadian law enforcement officers co-located in Buffalo, New York and tasked with combatting transnational criminal organizations ("TCOs") exploiting vulnerabilities of the shared international border. As such, I am an investigator or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516. Furthermore, per the Interagency Cooperation Agreement between the Drug Enforcement Administration ("DEA") and ICE/HSI, I am a cross-designated agent authorized to investigate violations of Title 21, United States Code.

    2.    As a Special Agent, I attended the Federal Law Enforcement Training Center ("FLETC") completing the Criminal Investigator Training Program ("CITP") and ICE Special Agent Training ("ICE SAT"). During this training, I received detailed training, both

academic and practical application, in the areas of informant handling/debriefing, drug packaging, pricing, importation, and trafficking methods.   In addition, I received both academic and practical application training in surveillance and counter surveillance techniques/methods.  I received legal instruction in Federal drug conspiracy laws, preparing drug affidavits, the Controlled Substances Act, Fourth Amendment Searches and Seizures, Federal Rules of Evidence, and the execution of search warrants.

3.     Based on my training and experience, I am familiar with how controlled substances are cultivated, manufactured, processed, packaged, distributed, sold and used within the framework of drug trafficking and how drug traffickers utilize wire communications to facilitate their illegal activities. I have participated in investigations which have employed the interception of wire, oral, and electronic communications authorized by the Federal courts in the Western District of New York.   While participating in these investigations, I have reviewed and analyzed recorded conversations and records of drug traffickers and money launderers. Through training and experience I have learned and become very familiar with the coded language used by drug trafficking organizations to conceal illegal activities from law enforcement.  I am familiar with many of the methods and techniques used by narcotics traffickers to launder and legitimize drug proceeds in an effort to avoid law enforcement detection and other government mandated reporting requirements.

4.     This affidavit is made in support of a federal search warrant application for the following cellular phones and subscriber identity modules or subscriber identification modules ("SIM"), widely known as a SIM cards, recovered during a vehicle inventory search conducted following the arrest of **JAI HUNTER**: one (1) Silver LG/Metro PCS Cell Phone

with no identifiable number in a black protective case ("**Subject Phone 1**"); one (1) black iPhone/Cricket cell phone, with no identifiable number, in a black protective case ("**Subject Phone 2**") (collectively, the "Subject Telephones"); one (1) black MuveMusic SIM card with no identifiable number ("**SD Card 1**"); one (1) blue MuveMusic SIM card with no identifiable number ("**SD Card 2**"); and one (1) black SanDisk SIM card with no identifiable number ("**SD Card 3**") (collectively, the "Subject SD Cards") currently stored within the custody of HSI, located at 535 Washington Street, Buffalo, NY.

5.     I have set forth only the facts that I believe are necessary to establish probable cause to believe that the Subject Telephones and the Subject SD Cards, described above, are evidence of, were used in committing, and/or contain evidence/fruits/instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with the intent to distribute, and to distribute, cocaine, a Schedule II controlled substance); 21 U.S.C. § 843(b) (use of a communication facility in furtherance of a controlled substance felony); 21 U.S.C. § 844(a) (simple unlawful possession of cocaine); and 21 U.S.C. § 846 (conspiracy to possess with the intent to distribute, and to distribute, cocaine, a Schedule II controlled substance) (hereinafter, the "Enumerated Offenses").

6.     The information contained in this affidavit is based upon my participation in the investigation and upon reports and information received from other law enforcement officers and agencies.  This affidavit is provided for the limited purpose of establishing probable cause to support the attached search warrant application and therefore does not contain each and every detail of the investigation.

## PROBABLE CAUSE

7.      On October 14, 2017, HSI El Paso special agents seized 10 pressed powder bricks destined for Buffalo, NY.  Subsequent laboratory testing confirmed that the 10 pressed powder bricks contained approximately 10 kilograms of cocaine.  HSI El Paso and HSI Buffalo subsequently coordinated and conducted a controlled delivery of 10 pressed powder bricks (sham) on or about October 19, 2017, that resulted in the federal arrest of Eduardo Valdez and the seizure of approximately $274,000 within the Western District of New York.

8.      Through the continuing investigation, HSI identified **GILBERTO ALARCON-HOLGUIN a/k/a BETO** as the source of supply and **EDGAR PAVIA** as the broker/distributor of the bulk quantity cocaine seized on October 14, 2017. HSI has identified **ALARCON-HOLGUIN**'s and **PAVIA**'s bulk quantity cocaine customer in Buffalo, NY, as **ADRIAN GOUDELOCK**.  **PAVIA, GOUDELOCK,** and **ALARCON-HOLGUIN** have continued to utilize multiple cellular telephones to communicate with each other since the October 2017 seizures.  It also appears to your affiant that members of the TCO have become familiar with law enforcement techniques and capabilities to identify and track cellular devices used to facilitate criminal activities and are employing methods to avoid law enforcement detection and identification.

9.      Based on my training, experience, and conversations with other law enforcement officers, individuals and organizations engaged in criminal activity utilize various methods to avoid law enforcement detection and identification.  Two basic methods are: (1) the utilization and frequent replacement of "dirty" phones, and (2) switching or replacing subscriber identity module ("SIM") cards in a "dirty" phone.  When using the term

4

"dirty" phone, your affiant is referring to a cellular telephone primarily, if not exclusively, used to facilitate illegal activity between co-conspirators at risk of arrest and prosecution. The use of a "dirty" phone in this manner is for the purpose of separating or "walling off" associates conducting criminal activities from individuals who are part of the "criminal's" identity and real life. Many times, "criminals" have moved on to the next "dirty" phone by the time law enforcement is aware of the phone. The term "dirty" phone is synonymous with the terms "burner" and "drop" phones.   When your affiant refers to replacing SIM cards, your affiant is referencing the practice of physically removing a SIM card (containing the international mobile subscriber identity or "IMSI") from a cellular telephone and replacing it with a new SIM card (new IMSI) within the same cellular device.   Cellular devices are identified by an international mobile equipment identity ("IMEI").   Based upon my training, experience, and conversations with other law enforcement officers, I know this method to be utilized by individuals engaged in narcotics trafficking as an inexpensive attempt to avoid detection of law enforcement.

10.     For example: Cellular Telephone A (IMEI#-A) is purchased and activated with SIM card A (IMSI#-A).   SIM card B (IMSI#-B) is purchased separately.   SIM Card A is removed from Cellular Telephone A, SIM card B is placed in Cellular Telephone A. Although there are different cellular service numbers and different IMSI#s for each SIM card (A and B), the cellular service provider maintains information both SIM cards were utilized in the same cellular device, IMEI#-A.

11.     Through the course of the investigation, HSI has employed a number of investigative techniques to identify, obtain, and monitor the devices and communications of

and between **PAVIA**, **GOUDELOCK**, and **ALARCON-HOLGUIN**, including, but not limited to, pen registers and trap and trace devices, cell-site simulators, historical and precision location cell-site data, and wire interceptions.

12.     Based on these efforts, HSI has been able to identify and update current phone numbers associated with **PAVIA**, **GOUDELOCK**, **ALARCON-HOLGUIN** and monitor their phone activity.  On June 19, 2018, a phone call was intercepted, pursuant to judicial authorization, between **PAVIA** and **GOUDELOCK** wherein they discussed the coordination of an imminent shipment of bulk cocaine to Buffalo, NY.

### JUNE 21, 2018 SURVEILLANCE

13.     On June 21, 2018, HSI conducted surveillance of **GOUDELOCK** and observed him park his Mercedes SUV in a parking lot before meeting with a previously unknown co-conspirator, later identified as **JAI HUNTER**.  **GOUDELOCK** entered **HUNTER**'s Dodge Durango and subsequently traveled to 310 Adams Street, Buffalo, NY. Upon arriving at the Adams address, **GOUDELOCK** exited the Durango and was observed speaking with two unidentified co-conspirators on the steps of the residence.  At the end of the conversation, one of the co-conspirators entered the residence while **GOUDELOCK** returned to **HUNTER**'s Durango.  Shortly thereafter, the unknown co-conspirator exited the residence and walked to **HUNTER**'s Durango carrying a large duffel bag, which appeared to be heavily weighted.  The unknown co-conspirator deposited the duffel bag into the Durango while **GOUDELOCK** and **HUNTER** were seated in the front seats.

6

14.     **GOUDELOCK** and **HUNTER** then departed Adams and traveled to an apartment building located at 84 Elmwood Avenue. **HUNTER** was observed retrieving the duffel bag from the rear of the vehicle and bringing it inside the building through the main door, while **GOUDELOCK** waited in the vehicle. Shortly thereafter, **HUNTER** returned to the vehicle. The Durango left and made a large circle to the east, making no stops, driving around for 20 minutes, before returning to 84 Elmwood. Your affiant believes that this was an attempt to detect the presence of law enforcement following the Durango before returning to 84 Elmwood.

15.     Upon returning to 84 Elmwood, both **GOUDELOCK** and **HUNTER** entered the apartment building located there. After approximately an hour, **GOUDELOCK** left the address carrying a square-shaped bag (consistent with the shape of a kilogram brick) and **HUNTER** exited the building carrying a white trash bag with blue tie handles. **GOUDELOCK** returned to the Durango while **HUNTER** walked around the opposite side of the building to a dumpster and discarded the bag he was carrying. After **GOUDELOCK** and **HUNTER** entered the Durango and left the area, law enforcement retrieved the trash bag with blue handles from the dumpster and discovered plastic and cellophane wrappings which later tested positive for the presence of cocaine. Based on this, as well as the other information, your affiant believes that on June 21, 2018, kilograms of cocaine were obtained by **GOUDELOCK** and **HUNTER**.

## JULY 14, 2018 BORDER CROSSING

16. On July 14, 2018, at approximately 6:37 p.m., **HUNTER** was encountered by United States Customs and Border Protection ("CBP") at the Peace Bridge, Buffalo port of entry, in the same white Dodge Durango (NY/HKC5298). The vehicle was operated by Jasmine Clemons. The vehicle and occupants were referred to a secondary inspection pursuant to an HSI Buffalo lookout record.

17. During the course of the secondary inspection, CBPOs discovered a toiletry bag contained within a factory compartment located under the floor in the luggage compartment of the vehicle. The toiletry bag was found to contain basic toiletry items as well as two (2) cellular telephones.

18. **HUNTER** was not questioned about the multiple cellular telephones secreted in a toiletry bag in a rear compartment of the vehicle. Your affiant believes one or both occupants of the vehicle were attempting to conceal the two cell phones from CPB by hiding the items in the manner described above.

## JULY 25, 2018 SEIZURE

19. On July 25, 2018, HSI conducted an operation that resulted in the seizure of approximately 17 kilograms of cocaine, $664,960 in bulk cash, and three arrests in the Western District of New York. Communication intercepted over **PAVIA**'s phone before and after the seizure indicates that the cocaine was destined for **GOUDELOCK**.

20.     During the operation, at or about 4:50 p.m., Erie County Sheriff's Office ("ECSO") deputies stopped known **GOUDELOCK** associate **LANCE PARKER** in possession of approximately 17 kilograms of cocaine and placed him under arrest.  In addition, the driver of the tractor-trailer delivering the cocaine, **ERIC YOUNG**, and an associate were arrested. $664,960 was recovered (the bulk of the money was contained in individually labeled packages, including one marked "Eric") from **YOUNG**'s truck.

21.     Prior to the law enforcement seizure on July 25, 2018, at approximately 2:12 p.m., **PAVIA** called **GOUDELOCK** and discussed the imminent shipment of bulk cocaine to Buffalo, NY.  The following transcription is a portion of the intercepted conversation:

| | |
|---|---|
| **PAVIA:** | Uh, okay, it's fifty-two, out of those fifty-two you gonna make uh—minus ten . . . |
| **GOUDELOCK:** | One in a . . . I'm turnin' one into fifteen. |
| **PAVIA:** | Yeah, it's still going to be fifty-one so it's going to be . . . it's still gonna be fifty-two package with uh, with his. |
| **GOUDELOCK:** | Right.  You just want me to write his name on his? |
| **PAVIA** | Yea, just write his name on it.  Just uh . . . make uh, tape it, give it to him, just put Eric on it and that's about it.  He should be giving you seventeen 'cause they were going seven to other person but I guess . . . I don't know what happened do I don't—they decided to give it to us. |

22.     Based upon my training, experience, familiarity with the modus operandi of this TCO, conversations with other law enforcement officers, and on other intercepted conversations, your affiant believes this conversation referred to packaging $15,000 for the driver, **ERIC YOUNG**.  **PAVIA** indicated to **GOUDELOCK** that there would be 51

bundles, plus a bundle labeled "Eric." Moreover, he informed **GOUDELOCK** that he would be getting 17 kilograms of cocaine rather than the originally anticipated 10 kilograms.

23.     At or about 4:52 p.m. on the date of the seizure, within minutes of the traffic stop of **PARKER**, **PAVIA** received an incoming call from **GOUDELOCK**. The communication was intercepted pursuant to **18-MR-216**. The following is a transcript of the call:

| | |
|---|---|
| **GOUDELOCK:** | [U/I] My cousin just saw them come up. The sheriffs pulled him over. |
| **PAVIA:** | What was that? |
| **GOUDELOCK:** | [U/I] they pulling my cousin over. |
| **PAVIA:** | Your cousin? |
| **GOUDELOCK:** | Yeah, he said the sheriffs pulled him over. |
| **PAVIA:** | Uh… did he have everything or how, how, how? What's the thing? What's the deal? |
| **GOUDELOCK:** | He had the, he, he had, he had the sh-, they gave him the shit, he had that shit on him. |
| **PAVIA:** | So he had, he has the product? |
| **GOUDELOCK:** | Yeah. |
| **PAVIA:** | And they pulled him over? |
| **GOUDELOCK:** | Yeah, they pulled him over. |
| **PAVIA:** | Fuck! |

| | |
|---|---|
| **GOUDELOCK:** | I was on the phone with him just to make sure he made it back home safe and he's like, "Shit, cus! The fucking sheriffs are pulling me over." |
| **PAVIA:** | Holy shit! Man! Let me see what's the uh, let me know what's going on. Let me know what's happened. They got, they got their shit, right? |
| **GOUDELOCK:** | Yeah, |
| **PAVIA:** | They got their envelopes and all that shit? |
| **GOUDELOCK:** | Yeah, they got their envelopes. |

24.    On July 25, 2018, at approximately 5:20 p.m., law enforcement personnel conducting surveillance on the white Dodge Durango observed **GOUDELOCK** meeting with the white Dodge Durango and entering the front passenger seat. Minutes later, the white Dodge Durango stopped at a gas station and **HUNTER** exited the driver seat. **GOUDELOCK** was still a passenger in the white Dodge Durango.

25.    At or about 7:11 p.m., on the same date, **PAVIA** received another incoming call from **GOUDELOCK** regarding **PARKER**'s arrest. The following transcription is a portion of the intercepted conversation:

| | |
|---|---|
| **GOUDELOCK:** | I was talkin' to him on the phone, he said… he was like five minutes away from home and he's like, he's like oh shit, cuz, the sheriffs pullin' me over.  Sheriffs don't usually pull nobody over.  You know what I'm sayin'? |
| **PAVIA:** | Yeah, yeah – [Voices Overlap] |
| **GOUDELOCK:** | So, he's like, "The sheriffs pullin' me over." So, that had to be somethin' on they end. You know what I'm sayin'? |

| **PAVIA** | Shit, well, well...what'cha think?   We keep going, or...what you wanna do? |
| **GOUDELOCK** | We can keep goin', but I say let's just chill for a few weeks then. |

Your affiant believes that **GOUDELOCK** is telling **PAVIA** that they should wait a few weeks before continuing their drug trafficking activity.

26.     HSI Buffalo applied for and was granted a GPS mobile tracking device (18-MJ-5164), or a "tracking" warrant, for **GOUDELOCK**'s black Mercedes-Benz on June 20, 2018. HSI Buffalo also obtained "tracking" warrant (18-MJ-5148-01) for the white Dodge Durango on June 28, 2018.

27.     HSI reviewed the tracker data associated with **GOUDELOCK**'s vehicle (18-MJ-5164) and **HUNTER**'s Dodge Durango (18-MJ-5148-01) around the time the referenced call took place (see ¶25, supra) pursuant to lawful court authorization.  The data showed **GOUDELOCK**'s vehicle was located in or near a parking lot at McNeeley Way, Buffalo, NY. This parking lot is located within a public housing complex, is only accessible by vehicles using McNeeley Way, and is surrounded by buildings and/or vegetation on all sides, making surveillance of the area extremely difficult, if not impossible, without being detected.  Your affiant believes **GOUDELOCK**'s behavior reflects his efforts to lose or "shake" law enforcement surveilling him.

28.     Over the next several hours, **GOUDELOCK**'s vehicle did not move. However, a review of prospective location information for one of his cellular phones demonstrated the cellular device was "pinging" at or near the same location as **HUNTER**'s

12

Dodge Durango at or about the same times.  At 6:23 p.m., 6:24 p.m., and 6:25 p.m., **GOUDELOCK**'s aforementioned phone "pinged" in an area encompassing **HUNTER**'s residence at the same time **HUNTER**'s Dodge Durango reported at **HUNTER**'s residence. This data is consistent with **HUNTER** picking up **GOUDELOCK** in the Dodge Durango and transporting him to **HUNTER**'s residence.

29.   On October 10, 2018, a four-count superseding indictment (18-CR-138-V) was returned in the Western District of New York charging **EDUARDO VALDEZ, EDGAR PAVIA, ADRIAN GOUDELOCK, ERIC YOUNG, LANCE PARKER**, and **JAI HUNTER** with violations of Title 21, United States Code, Sections 841(a)(1) and 846; Title 18, United States Code, Sections 1956(h) and 2 (4 Counts and 2 Forfeiture Allegations).  A federal arrest warrant was issued for **HUNTER** on that date.

30.   On October 11, 2018, **HUNTER** was arrested by ECSO and HSI pursuant to the federal arrest warrant.  Following the arrest, the Dodge Durango (NY/HKC5298) driven by **HUNTER** was impounded by the ECSO and an inventory search was conducted.  During the inventory search, **Subject Phone 1** and **Subject Phone 2** were located on the front passenger seat.  **HUNTER**'s wallet, containing his New York State driver's license, was also recovered.  The wallet contained **SD Card 1, SD Card 2**, and **SD Card 3**, among other miscellaneous cards and documents.  **Subject Phone 1, Subject Phone 2**, and the wallet with contents were seized and turned over to HSI on October 11, 2018.

## SUMMARY OF RELEVANT TECHNOLOGY

31.     A cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other cellular telephones or traditional "landline" telephones. A cellular telephone usually includes a "call log," which records the telephone number, date, and time of calls made to and from the phone.

32.     In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on your affiant's training and experience, and the information learned throughout this investigation, persons associated with drug trafficking organizations utilize cellular telephones to communicate with others about the possession, transportation, and distribution of controlled substances, including cocaine.

33.     According to Wikipedia, a Secure Digital card ("SD card") is a non-volatile memory card designed for use in portable devices. Such cards are often used in, among other electronics, digital cameras, camcorders, video game consoles, and cellular phones. SD cards

are manufactured with anywhere from 4 megabytes up to 2 terabytes of memory. The card's asymmetrical shaped sides prevent inserting it upside down.

## SEEKING AUTHORIZATION TO SEARCH AND SEIZE

34.     Based on my training, experience, and conversations with other law enforcement officers, individuals engaged in drug trafficking often possess multiple cellular phones. Drug traffickers and their co-conspirators commonly possess multiple cellular phones in an effort to wall off family and friends and avoid detection and identification by law enforcement, as further described in ¶¶ 9 and 10, supra.

35.     Accordingly, the application seeks authorization to search for and seize all:

a.      Records of telephone calls, including incoming, outgoing, and missed calls, phone contact addresses, email addresses and telephone numbers in directories, documents and files which reflect names, email addresses, addresses, telephone numbers and objects related to drug trafficking, and photographs regarding drug trafficking and drug trafficking associates contained in the cellular telephones and SD cards;

b.      Text messages and emails contained in the cellular telephones and SD cards related to drug trafficking and drug trafficking associates; and

c.      Records regarding the ownership and/or possession of the searched items.

36.     Based on my training, my experience, my participation in other narcotics investigations, my participation in this investigation, and my discussions with other experienced law enforcement personnel, I have learned that significant narcotics traffickers, such as traffickers of cocaine and other controlled substances, frequently maintain in portable mobile communication and storage devices incoming and outgoing calls and text messages,

addresses, email addresses and telephone numbers in directories, documents and files which reflect names, email addresses, addresses, telephone numbers, and objects related to drug trafficking, and photographs regarding drug trafficking and drug trafficking associates in their cellular telephones.

37.     Based on your affiant's experience, there is probable cause to believe the Subject Phones and the Subject SD Cards are evidence of and/or contain evidence of the Enumerated Offenses.   There is probable cause to believe **HUNTER** utilized these cellular devices to contact **GOUDELOCK** and other co-conspirators and used the SD cards to store information regarding the conspiracy to distribute and to distribute cocaine. As such, I believe that the Subject Phones and Subject SD Cards described above contain evidence of the Enumerated Offenses that have been committed by **HUNTER** and others.

38.     Based on your affiant's knowledge and training and the experience of other agents with whom I have discussed this investigation, I know that in order to completely and accurately retrieve data maintained in cellular telephones hardware or software, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or intentional destruction, it is often necessary that the cellular telephones, related instructions in the form of manuals and notes, as well as the software utilized to operate such a device, be seized and subsequently processed by a qualified specialist in a laboratory setting.

## ANALYSIS OF ELECTRONIC DATA

39.     The search warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure.

40.     Searching the cellular telephones for the evidence described above may require a range of data analysis techniques.  In some cases, it is possible for agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  For example, agents may be able to execute a "keyword" search that searches through the files stored in a cellular telephone for special words that are likely to appear only in the materials covered in the warrant by looking for particular directory or file names.  In other cases, however, such techniques may not yield the evidence described in the warrant.  Suspected criminals have the ability to mislabel or hide information and directories, encode communications to avoid using key words, attempt to delete files to evade detection, or take other steps designed to frustrate law enforcement searches for information.  These steps may require agents to conduct more extensive searches, such as scanning areas of the device's memory not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described above.

41.     It should be noted that due to the level of encryption that is anticipated on the Subject Phones, the process to extract the information from the phones may lead to the destruction of the phones themselves.

42.     Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**WHEREFORE**, based upon the foregoing, your affiant submits that there is probable cause to believe that the Subject Phones and Subject SD Cards are evidence of, and/or contain evidence of the Enumerated Offenses, and/or evidence of other co-conspirators involved in the Enumerated Offenses, which have been and continue to be committed.

_____
JOSEPH J. STROH
Special Agent
Homeland Security Investigations

Sworn to before me

this /s t day of November, 2018.

_____
HONORABLE H. KENNETH SCHROEDER, JR.
United States Magistrate Judge